UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  06/2/2023
```

-------------------------------------------------------------------X
                                          :

ROBERT E. SMOLEN,                         :

                       Plaintiff,         :

                                         :          22-cv-44 (LJL)

        -v-                           :

                                       :       OPINION AND ORDER

FEDERAL AVIATION ADMINISTRATION,   :

                                     :

                     Defendant.      :

                                     :

-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Air traffic control in U.S. airspace is controlled and regulated by the Federal Aviation Administration ("FAA" or "Defendant"), which is responsible for Airport Traffic Control Towers and Terminal Radar Approach Control facilities that guide aircraft through their various phases of flight. Dkt. No. 38 ¶ 6. For years, management for radar arrivals and departures into the Newark Liberty International Airport ("EWR"), along with other airports, has been managed by the New York Terminal Radar Approach Control Facility ("NY TRACON" or "N90"). *Id.* ¶¶ 6–7. On August 21, 2020, however, the FAA notified the National Air Traffic Controllers Association, AFL-CIO ("NATCA") of its "decision to realign the responsibility for the Newark (EWR) sector airspace from New York TRACON to the Philadelphia [Air Traffic Control Tower]" ("Philadelphia ATCT") ("Realignment Determination"). Dkt. No. 39 ¶ 18; Dkt. No. 40 ¶ 2. On February 5, 2021, the FAA and NATCA entered into a signed memorandum of understanding ("MOU") regarding the realignment that purported to "resolve any and all issues concerning this relocation," including with respect to the process for determining how many controllers would be transferred, the treatment of N90 EWR employees not transferred to the Philadelphia ATCT, the payment of awards and provision of pay increases for those employees

who transferred and those who were internally reassigned, the reimbursement of traveling expenses, and training requirements.  Dkt. No. 38-7 at ECF pp. 36–43.

The decision apparently was taken because for years, the FAA has had difficulty staffing the NY TRACON with enough certified professional controllers.  Dkt. No. 38 ¶ 7.  The Philadelphia ATCT currently has a tower and a radar facility that control aircraft arrivals into and departures out of Philadelphia International Airport.  *Id.*  The FAA upgraded the Philadelphia ATCT radar room to increase capacity so certified professional controllers can provide service to both Philadelphia and Newark airspaces.  *Id.*

Plaintiff Robert E. Smolen ("Smolen" or "Plaintiff") is an air traffic controller employed by the FAA at NY TRACON.  Dkt. No 29 ¶ 7.  Alleging a concern for the impact of the decision on the workface and on the national airspace system, and concerned that the FAA might be violating Section 804 of the FAA Modernization and Reform Act of 2012, Plaintiff requested records regarding the Realignment Determination from the FAA pursuant to the Freedom of Information Act ("FOIA").  *Id*.  He also states that the FAA did not conduct a safety/risk management analysis prior to entering the final MOU.  Dkt. No. 44 at 3.  When the FAA withheld records under FOIA's exemptions and failed to respond to Plaintiff's appeal within the statutory timeframe, Plaintiff filed this suit.  Dkt. Nos. 1, 29.

Defendant now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Dkt. No. 36.  Plaintiff cross-moves for summary judgment.  Dkt. No. 43.  For the reasons that follow, Defendant's motion is granted and Plaintiff's motion is denied.

## BACKGROUND

The following facts are undisputed for purposes of summary judgment except where otherwise indicated.

I.      **The Realignment Determination**

On August 21, 2020, the FAA notified NATCA of its "decision to realign the responsibility for the Newark (EWR) sector airspace from New York TRACON to Philadelphia ATCT (PHL) no earlier than twelve (12) months from [August 21, 2020] . . . ."  Dkt. No. 39 ¶ 18 (quoting Dkt. No. 39-1); Dkt. No. 40 ¶¶ 2, 10.  The notification indicated that "[t]he decision to realign responsibility for the EWR sector airspace is based on the critical staffing shortfalls at N90 . . . .  The Agency does not intend to reassign any bargaining unit employees from N90 to PHL.  However, intra-facility reassignments will occur simultaneously with the realignment of the EWR Sector."  Dkt. No. 39 ¶ 18 (quoting Dkt. No. 39-1).

The notification commenced collective bargaining negotiations between the FAA and NATCA, which is the labor union certified by the Federal Labor Relations Authority to be the exclusive bargaining representative of air traffic control specialists and other aviation safety employees employed by the FAA, Dkt. No. 40 ¶¶ 8, 10; *see also* Dkt. No. 39 ¶ 3.  The FAA's team consisted of Wendy Pisman, Jeffrey Vincent, and Shelly Mlakar.  Dkt. No. 40 ¶ 10.  NATCA's negotiation team consisted of Dean Iacopelli, Nicole Vitale, and Grant Mulkey.  *Id.* During the collective bargaining negotiations, NATCA submitted to the FAA its negotiation proposals in the form of draft memoranda of understanding and the FAA made counterproposals in the form of draft memoranda of understanding (the "Draft MOUs").  *Id.*; Dkt. No. 39 ¶ 21. Each of the Draft MOUs were related to NATCA bargaining unit employees' pay and other conditions of employment.  Dkt. No. 39 ¶ 21.  NATCA's draft MOUs contained NATCA's bargaining positions throughout the collective bargaining negotiations concerning the FAA's determination to relocate the Newark area from N90 to PHL and the process by which employees would volunteer and/or be administratively reassigned from N90 to PHL.  *Id.* ¶ 30. The FAA's counterproposals, which followed the formatting of NATCA's draft MOUs, reveal

NATCA's bargaining positions as well, because the FAA used track changes in a Microsoft Word document on top of NATCA's proposals to indicate where it agreed and where it proposed different language.  *Id.* ¶ 31.  The Draft MOUs were treated as confidential.  They were closely-held and shared only with individuals who were responsible for negotiating the collective bargaining agreement or who were subject matter experts brought into the Union-side caucus to help draft the proposals and counterproposals.  *Id*. ¶ 29.

Ultimately, after the FAA and NATCA exchanged multiple proposals, they reached agreement and the resulting MOU, dated February 5, 2021, was shared with the affected bargaining unit employees.  *See* Dkt. No. 38-7 at ECF pp. 36–43.  The final MOU was signed by Mlakar, Pisman, and Vincent on behalf of the FAA and by Iacopelli, Vitale, and Mulkey on behalf of NATCA.  *Id*. at ECF p. 43

## II.    Plaintiff's FOIA Requests

This case involves the second of two FOIA requests submitted by Plaintiff to the FAA. On December 16, 2020, Plaintiff submitted a FOIA request to the FAA, which was assigned FOIA Control Number 2021-001963 ("Prior FOIA Request").  Dkt. No. 38 ¶ 10.  The Prior FOIA Request sought: "any documentation pertaining to FAA's proposed move of the EWR sector at New York Tracon to PHL TRACON" and "any documentation and communication by email or any other source with NATCA and its President Paul Rinaldi regarding the proposed move of the EWR area at NY TRACON to PHL TRACON."  *Id.*; Dkt. No. 38-1.

On March 26, 2021, Plaintiff sent a letter to Dean Torgerson, Manager of the Air Traffic Organization ("ATO") FOIA Program, clarifying that he was requesting "any records of communication or Memorandums of Understanding between Paul Rinaldi, President of NATCA and the Federal Aviation Administration regarding the transfer of the EWR area from NEW YORK TRACON to PHL between the time period of Jan. 1 2019 to the present day," but he was

not requesting "the EWR Airspace Relocation MOU signed on February 5th, 2021." Dkt. No. 38-2 at ECF pp. 1–2.

The FAA responded on April 19, 2021 with two responsive records. The first record was an email from FAA Labor Relations Specialist Pisman to NATCA President Rinaldi, dated August 21, 2020, providing NATCA notice of the FAA's Realignment Determination and indicating that a letter from Pisman to Rinaldi of the same date was attached. The email copied NATCA employees Iacopelli, Vitale, and Kendal Manson, and FAA employees Mlakar and Michael Doss. The second record was the attached FAA's Realignment Notification letter. Dkt. No. 38-3.

On April 19, 2021, Plaintiff submitted to the FAA the FOIA request that is the subject of this suit, which was assigned FOIA Control Number 2021-003118 ("Plaintiff's FOIA Request"). Dkt. No. 38-4; Dkt. No. 40 ¶ 6. Plaintiff's FOIA Request sought "any responses from Mr. Paul Rinaldi, Mr. Dean Iacopelli, Ms. Nicole Vitale, or Ms. Kendal Manson to the two email letters from Ms. Wendy Pisman that you have provided, and any responses the agency has received from anyone in NATCA regarding the EWR area location." Dkt. No. 38-4 at ECF p. 1. The FAA responded on May 17, 2021, with fifty-eight pages of responsive records, including the Draft MOUs exchanged between the FAA and NATCA during the collective bargaining negotiations. Dkt. No. 38-5. Twenty-six pages were produced in full other than employee cellphone numbers, three pages were produced in part, and twenty-nine pages were withheld in full. The FAA informed Plaintiff that it had withheld portions of those records pursuant to FOIA Exemption 2, 5 U.S.C. § 552(b)(2), Exemption 4, *id.* § 552(b)(4), and Exemption 6, *id.* § 552(b)(6). Dkt. No. 38-5.

On May 19, 2021, Plaintiff submitted an administrative appeal challenging the FAA's withholdings pursuant to Exemptions 2 and 4.  Dkt. No. 38-6.  Plaintiff did not challenge the FAA's withholdings pursuant to Exemption 6 or the adequacy of the FAA's search for responsive records.  *Id.*  On June 30, 2022, the FAA responded to Plaintiff's appeal, rejecting Plaintiff's argument that the withheld information was not exempt from public disclosure under Exemption 4.  Dkt. No. 38 ¶ 22; Dkt. No. 38-8.

### III.   Defendant's Search for and Production of Records Responsive to the FOIA Request

Plaintiff's FOIA Request was submitted on April 19, 2021.  Dkt. No. 40 ¶ 6.  Mlakar, Senior Advisor of the FAA's Technical Labor office in FAA's Air Traffic Organization, was assigned responsibility for the search.  *Id.* ¶¶ 1, 7.  Mlakar serves as the primary representative of the ATO on FAA labor matters involving unions.  *Id.*  She served as the lead member of the FAA's negotiation team during the collective bargaining negotiations between the FAA and NATCA regarding the impact and implementation of the Realignment Determination.  *Id.* ¶ 2.

Mlakar conducted the search for responsive records in approximately April or May 2021.  *Id.* ¶ 14.  She conducted a search of her inbox and outbox messages in her FAA Microsoft Outlook email account with the terms, "Paul Rinaldi," "Dean Iacopelli," Nicole Vitale," "Kendal Mason," and "Wendy Pisman."  *Id.*  She also used the term "Grant Mulkey" for her search because, even though Plaintiff did not identify Mulkey in his FOIA Request, Mulkey was part of NATCA's negotiation team.  *Id.*  She also searched using the terms "EWR Airspace Realignment" and "NATCA" to ensure that she captured responsive records.  *Id.*  She determined that the search would locate responsive communications from NATCA because Rinaldi, Iacopelli, Vitale, Mason, and Mulkey were the only NATCA personnel authorized to communicate with the FAA during the collective bargaining negotiations and because, as the lead negotiator for the FAA negotiation team, she was included on each email exchanged during

the collective bargaining negotiations.  *Id.* ¶¶ 14, 16.  To ensure that the search was adequate and reasonably calculated to uncover all potentially responsive records, Pisman also conducted the same search in her FAA Microsoft Outlook email account; she did not find any additional records responsive to Plaintiff's FOIA Request.  *Id.* ¶ 16.

As noted, the search yielded fifty-eight pages of records responsive to Plaintiff's FOIA Request.  Dkt. No. 38 ¶ 16.  The FAA processed those records and released them to Plaintiff on May 17, 2021.  Dkt. No. 40 ¶ 18.  Defendant withheld the mobile phone numbers of the individuals whose contact information appeared in the responsive documents pursuant to Exemption 6 for personal information.  Dkt. No. 38 ¶ 16.  It withheld the FAA's responses to questions submitted by NATCA following the FAA's formal briefing to NATCA's bargaining unit employees regarding the Realignment Determination pursuant to Exemption 2.  *Id.*  It also withheld the Draft MOUs exchanged between NATCA and FAA pursuant to Exemption 4.  *Id.*

On April 22, 2022, the FAA (through counsel) released additional information from the records that had been released to Plaintiff on May 17, 2021.  *Id.* ¶ 21.  The released records included certain information from the Draft MOUs.  The FAA withheld from this release those portions of the Draft MOUs that NATCA had asserted constitute NATCA's confidential commercial or financial information subject to Exemption 4.  *Id.*  Specifically, the FAA withheld portions of the four Draft MOUs over which NATCA and the FAA negotiated or constitute NATCA's proposals.  *Id.*; Dkt. No. 40 ¶ 18.  The FAA stated that NATCA had asserted a claim that the Draft MOUs contained its confidential commercial or financial information and informed Plaintiff of the FAA's determination that the information it was withholding was exempt from public disclosure pursuant to Exemption 4.  Dkt. No. 38 ¶ 22.

Finally, on November 16, 2022, the FAA conducted searches of the FAA Microsoft Outlook email accounts of Jeffrey Vincent and FAA employees Doss, Christopher Wilbanks, and Laura Glading, who had been copied on emails for their situational awareness, using the search terms used by Mlakar.  *Id.* ¶ 17.  Those searches, using a date range of August 1, 2020 to May 2021, did not uncover additional records responsive to Plaintiff's FOIA Request.  *Id*.

## PROCEDURAL HISTORY

Plaintiff filed this action on January 4, 2022.  Dkt. No. 1.  On September 13, 2022, he filed an amended complaint.  Dkt. No. 29.  Plaintiff asserts three claims for relief: (1) improper withholding of documents responsive to his request pursuant to Exemption 4, *id.* ¶¶ 61–69; (2) failure to respond to his appeal within the applicable statutory timeframe, *id.* ¶¶ 70–76; and (3) failure to conduct an adequate search and to provide Plaintiff with a reasonably detailed affidavit describing the search performed, *id.* ¶¶ 77–80.

Defendant filed this motion for summary judgment on December 1, 2022, along with a memorandum of law and three declarations in support of the motion.  Dkt. Nos. 36–40.  On January 10, 2023, Plaintiff filed a cross-motion for summary judgment and a memorandum in support of that motion and in opposition to Defendant's motion.  Dkt. Nos. 43–44.  Defendant filed a reply memorandum in further support of its motion for summary judgment and in opposition to Plaintiff's cross-motion for summary judgment on March 15, 2023.  Dkt. No. 49. That memorandum was accompanied by an additional declaration.  Dkt. No. 50.  On April 11, 2023, Plaintiff filed a reply memorandum in further support of his cross-motion for summary judgment.  Dkt. No. 52.

## DISCUSSION

This case principally raises two issues: (1) whether the FAA improperly withheld portions of the Draft MOUs under Exemption 4; and (2) whether Plaintiff has exhausted his

administrative remedies for challenging the adequacy of Defendant's search and, if so, whether Defendant's search was inadequate.

## I.       The Withholding of Portions of the Draft MOUs

"FOIA was enacted to promote honest and open government and to assure the existence of an informed citizenry 'to hold the governors accountable to the governed.'" *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (quoting *Ethyl Corp. v. E.P.A.*, 25 F.3d 1241, 1245 (4th Cir. 1994)). Thus, "FOIA 'strongly favor[s] public disclosure of information in the possession of federal agencies.'" *Am. Oversight v. U.S. Dep't of Just.*, 45 F.4th 579, 587 (2d Cir. 2022) (quoting *Knight First Amend. Inst. at Columbia Univ. v. U.S. Citizenship & Immigr. Servs.*, 30 F.4th 318, 327 (2d Cir. 2022)).

There are only nine exclusive exemptions to FOIA's otherwise broad disclosure obligations. The FOIA is "structured [so that] virtually every document generated by [a federal] agency is available to the public in one form or another, unless it falls within one of the Act's nine exemptions." *Id.* (quoting *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975)). In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA. *See* 5 U.S.C. § 552(a)(4)(B); *E.P.A. v. Mink*, 410 U.S. 73, 79 (1973). "A district court in a FOIA case may grant summary judgment in favor of an agency 'on the basis of agency affidavits if they contain *reasonable specificity* of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Grand Cent. P'ship*, 166 F.3d at 478 (quoting *Gallant v. N.L.R.B.*, 26 F.3d 168, 171 (D.C. Cir. 1994)) (emphasis in original). The sworn declarations must be "factually uncontroverted and sufficiently detailed to have the exemption

appear 'logical and plausible.'" *Am. Oversight*, 45 F.4th at 587 (quoting *Knight First Amend. Inst. at Columbia Univ.*, 30 F.4th at 327).

If an agency's declarations are insufficiently detailed to determine whether an exemption applies, "the district court can either review the documents in camera or require the [agency] to provide a new declaration." *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 31 (D.C. Cir. 1998). "The latter course is favored where agency affidavits are facially inadequate." *Id.* "*[I]n camera* review is considered the exception, not the rule, and the propriety of such review is a matter entrusted to the district court's discretion." *Cox v. Dep't of Just.*, 504 F. Supp. 3d 119, 151 (E.D.N.Y. 2020) (quoting *Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO v. N.L.R.B.*, 845 F.2d 1177, 1180 (2d Cir. 1988)). Thus, generally, a "district court should first offer the agency the opportunity to demonstrate, through detailed affidavits and oral testimony, that the withheld information is clearly exempt and contains no segregable, nonexempt portions" before undertaking *in camera* review. *Am. C.L. Union v. U.S. Dep't of Just.*, 210 F. Supp. 3d 467, 485 (S.D.N.Y. 2016) (quoting *Spirko v. U.S. Postal Service*, 147 F.3d 992, 997 (D.C. Cir. 1998)); *see also Seife v. U.S. Dep't of State*, 298 F. Supp. 3d 592, 630 (S.D.N.Y. 2018) (same); *cf. Elec. Frontier Found. v. U.S. Dep't of Just.*, 826 F. Supp. 2d 157, 174–175 (D.D.C. 2011) ("Having found the DOJ's *Vaughn* submissions inadequate, the Court has several options regarding how to now proceed in this case . . . . [T]he Court finds that the best approach is to direct the agency to revise their *Vaughn* submissions, taking into account the deficiencies identified by the Court."). "*In camera* review of agency documents in dispute in FOIA actions is appropriate where, for example, (i) 'the record is vague or the agency claims too sweeping or suggestive of bad faith[,]'; (ii) the agency's affidavits are 'contradicted by other evidence in the record,'; or (iii) 'when the requested documents are few in number and of short length' such that 'in camera review may

save time and money.'"  *New York Times Co. v. U.S. Dep't of Just.*, 2021 WL 371784, at *7

(S.D.N.Y. Feb. 3, 2021) (citations omitted).

The FAA relies on Exemption 4 to FOIA to justify its withholding of portions of the

Draft MOUs.  Exemption 4 provides an exemption for "matters that are . . . trade secrets and

commercial or financial information obtained from a person and privileged or confidential."  5

U.S.C. § 552(b)(4).  "Exemption [4] applies if a tripartite test is satisfied: (1) The information for

which exemption is sought must be a trade secret or commercial or financial in character; (2) it

must be obtained from a person; and (3) it must be privileged or confidential."  *Bloomberg, L.P.*

*v. Bd. of Governors of the Fed. Rsrv. Sys.*, 601 F.3d 143, 147 (2d Cir. 2010) (quoting *Nadler v.*

*Fed. Deposit Ins. Corp.*, 92 F.3d 93, 95 (2d Cir. 1996)) (emphasis omitted).  Defendant has met

its burden to show that this three-part test has been satisfied.

With respect to the first part of the test, as previously noted, Exemption 4 "protects only

certain confidential information, namely confidential information that is commercial or financial

in nature."  *Seife v. U.S. Food & Drug Admin.*, 43 F.4th 231, 240 (2d Cir. 2022).  "[N]ot every

bit of information submitted to the government by a commercial entity qualifies for protection

under Exemption 4."  *New York Times Co.*, 2021 WL 371784, at *8 (quoting *Pub. Citizen Health*

*Rsch. Grp. v. U.S. Food & Drug Admin.*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)).  The Second

Circuit has not given a definitive interpretation of the terms "commercial or financial," but it has

stated "'[c]ommercial' surely means pertaining or relating to or dealing with commerce."  *Am.*

*Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978).  The D.C. Circuit has

stated that the exemption "applies (among other situations) when the provider of the information

has a commercial interest in the information submitted to the agency."  *Baker & Hostetler LLP v.*

*U.S. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006) (Kavanaugh, J.).

Defendant has established that the withheld information is commercial or financial in character.  The Draft MOUs contain NATCA's proposals and FAA's counterproposals with respect to the Realignment Determination.  Each of the proposals and counterproposals related to the pay and other conditions of employment of the business unit employees represented by NATCA.  Dkt. No. 39 ¶¶ 22, 35.  NATCA's draft MOUs reveal what the union demanded on behalf of the employees for those services, what it settled for, and the relative priority of its interests in connection with the transfer of employees from N90 to PHL.  *Id.* ¶¶ 30, 36.  FAA's counterproposals, which followed NATCA's draft MOU formatting, also reveal NATCA's bargaining positions because the FAA made its counterproposals by using the track changes function in Microsoft Word, thereby layering its proposals and its agreement to NATCA's proposals on top of NATCA's proposals.  *Id.* ¶ 31.

In this case, each of the Draft MOUs submitted by both parties covered topics such as (a) the internal reassignment of employees in the Newark Area of N90 to other areas of specialization within N90 if they weren't transferring to PHL;  (b) the payment of expenses for those who were permanently changing station;  (c) the pay setting of employees transferring from N90 to PHL;  (d) the lump-sum cash payments (awards) for employees who transfer from N90 to PHL and when those payments would vest;  (e) lump-sum awards to employees in the Newark Area of N90 reassigned to other areas within N90 and when those payments would vest;  (f) transfers within PHL to the new Newark area and when those payments would vest;  (g) when all of the above referenced payments would be paid out;  (h) what would happen to employees who failed to certify in their new areas of specialization;  (i) how the certified professional controller staffing targets of each facility would be affected by the transfer of the Newark Area;  (j) the facility pay level of N90 and PHL; and (k) and the pay setting for developmental career level air

traffic control specialists at N90. *Id*. ¶ 35. NATCA's confidential positions with respect to each of these matters, every one of which is a condition of employment, constitutes commercial information entitled to protection under FOIA. *See Am. Airlines,* 588 F.2d at 869 (stating that commercial or financial information includes labor-related information "pertaining to negotiation positions" (internal quotation marks omitted)).

Plaintiff argues that NATCA's information cannot constitute "commercial or financial information" because NATCA is a non-commercial tax-exempt organization and the Draft MOUs do not contain quintessential commercial information such as "sales statistics, inventories" or information instrumental to a commercial entity's operations. Dkt. No. 44 at 26–27. Plaintiff further argues that the information cannot be "commercial or financial" because NATCA has the exclusive right to represent all federally employed air traffic controllers and thus does not face competition from another labor organization. *Id.* Those arguments disregard the rules of statutory interpretation. *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019). FOIA protects from disclosure "commercial or financial information" obtained from a "person." 5 U.S.C. § 552(b)(4). As discussed in more detail below, FOIA defines a "person" as including "an individual, partnership, corporation, association, or public or private organization other than an agency." *Id*. § 551(2). It follows that an association need not generate taxable profits for its information be "commercial or financial," *id*. § 552(b)(4). There is no qualifier that the association or organization be for profit or generate taxable income; public organizations, for example, frequently do not generate taxable income. *See Am. Airlines,* 588 F.2d at 865 (holding that union information is "commercial or financial"). It is sufficient that it be an association and that the character of the information pertains to commerce. Non-profit organizations as well, just like public or private organizations, engage in commerce and have

commercial and financial information which is protected by FOIA Exemption 4. *See N.H. Right to Life v. U.S. Dep't of Health & Human Servs.*, 778 F.3d 43, 50 (1st Cir. 2015) ("All sorts of non-profits—hospitals, colleges, and even the National Football League—engage in commerce as that term is ordinarily understood. How the tax code treats income from that commerce is a separate issue that has no bearing on [whether the submitter's information is commercial or financial in nature]."); *Critical Mass Energy Project v. Nuclear Regulatory Com'n*, 830 F.2d 278, 281 (D.C. Cir. 1987), *rev'd on other grounds*, 975 F.2d 871 (D.C. Cir. 1992) ("INPO itself is a not-for-profit enterprise, but INPO's non-profit status is not determinative of the character of the information it reports; information may qualify as 'commercial' even if the provider's (*i.e.*, INPO's) interest in gathering, processing, and reporting the information is noncommercial."); *N.Y. Pub. Int. Rsch. Grp. v. U.S. E.P.A.*, 249 F. Supp. 2d 327, 333 (S.D.N.Y. 2003) (submitter's non-profit status is not dispositive of the character of the information it submits).

Likewise, the protection afforded by FOIA Exemption 4 is not limited to sales statistics or inventories. It extends to all "commercial or financial information" obtained from a person. Whatever the outer reaches of Exemption 4 may be, they would encompass the information at issue here. It is not disputed that the terms under which an individual employee would be prepared to offer his or her services to an employer would be "commercial" or "financial." It makes no difference that the terms being exchanged here related to groups of employees. NATCA is the exclusive representative of the air traffic controllers and the Draft MOUs contain information regarding the terms it was demanding for the services of those whom it represented and who also in turn were engaged in commerce. NATCA has the exclusive authority to negotiate with the FAA over the pay and conditions of employment with respect to the persons whose labor it supplies. Confidential information about the terms under which it is prepared to

offer that labor has just as much "intrinsic commercial value" as the information of a retailer about the sales of its products. *N.Y. Pub. Int. Rsch. Grp.*, 249 F. Supp. 2d at 333 ("[I]nformation about recruitment efforts provided to the government by labor unions may be exempted from production, even though labor unions do not have profit as their primary aim.").

Plaintiff relies on *Judicial Watch, Inc. v. U.S. Dep't of Health & Human Services*, 525 F. Supp. 3d 90 (D.D.C. 2021), and *New York Public Interest Research Group*, 249 F. Supp. 327. Both are distinguishable. *Judicial Watch* involved a FOIA request for information regarding contracts between the federal government and a private company for the provision of human fetal tissue to be used for medical research. 525 F. Supp. 3d at 94. The government withheld confidential information it obtained from the private company regarding the company's contract laboratories. The court did not dispute that information the government obtained as a contractual counterparty could be protected under Exemption 4. *Id.* at 98. The court rejected the government's argument because its claims regarding the names and addresses of the contract laboratories were conclusory—the government had failed to identify anything about "the names that logically or plausibly renders them commercial in nature or function." *Id.* (quoting *Besson v. U.S. Dep't of Com.*, 480 F. Supp. 3d 105, 112 (D.D.C. 2020)). In *New York Public Interest Research Group*, the question was the commercial nature of proposals submitted by a private corporation to the Environmental Protection Agency for the clean-up of a Superfund site. The proposals were submitted to advocate a policy position and to convince the regulator to adopt a less expensive remedy for the problem of the company dumping pollutants into public waterways. 249 F. Supp. 2d at 333–34. The court rejected the claim because there was no showing that the information revealed anything about the nature and character of the company's

business "or anything that a commercial business would want to protect for fear of competitive injury." *Id*. at 333.

Neither case is applicable here.  The information that the FAA seeks to protect from disclosure here on behalf of NATCA—information regarding the terms under which NATCA-represented employees were willing to offer their services—is of the nature that it would have commercial value to a company in the business of offering labor services.  And Defendant has submitted detailed information to support the commercial nature of that information.

Plaintiff also argues that NATCA's information cannot be protected under Exemption 4 because disclosure of the withheld documents would not result in competitive injury.  Dkt. No. 44 at 8.  At least in the D.C. Circuit, the threat of competitive injury was previously considered to be relevant to the Exemption 4 analysis.  The D.C. Circuit treated competitive harm as a requirement for the "confidentiality" prong of the Exemption 4 analysis and held that information would be considered "confidential" only if disclosure would "impair the Government's ability to obtain necessary information in the future; or . . . cause substantial harm to the competitive position of the person from whom the information was obtained."  *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974) (citation omitted).  In *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356, however, the Supreme Court rejected that argument and held the "'competitive harm' requirement [was] inconsistent with the terms of the statute."  *Id*. at 2361–64.  The Court reasoned that where "careful examination of the ordinary meaning and structure of [a] law itself . . . yields a clear answer, judges must stop," *id.* at 2364, and that "just as [courts] cannot properly *expand* Exemption 4 beyond what its terms permit, [courts] cannot arbitrarily *constrict* it either by adding limitations found nowhere in its terms," *id.* at 2366 (emphasis in original).  Thus, "competitive harm" to NATCA is irrelevant to

the "confidentiality" inquiry and, by parity of reasoning and because courts are limited to the plain meaning of Exemption 4, it is also not necessary for information to be considered "commercial or financial."  Even a monopolist may have commercial or financial information.

The second element that the FAA must satisfy is that the withheld information must be "obtained from a person."  5 U.S.C. § 552(b)(4).  "Exemption 4 thus aims to shield outside entities'—as opposed to Government's—confidential commercial and financial information from disclosure."  *Nat. Res. Def. Council, Inc. v. U.S. Dept. of Interior*, 36 F. Supp.3d 384, 400 (S.D.N.Y. 2014).  Information is not "obtained from a person" if the data were "generated within the Government."  *Bloomberg*, 601 F.3d at 148 (quoting *Bd. of Trade of Chi. v. Commodity Futures Trading Comm'n*, 627 F.2d 392, 404 (D.C. Cir. 1980)); *see also Immerso v. U.S. Dep't of Lab.*, 2020 WL 6826271, at *5 (E.D.N.Y. Nov. 20, 2020), *aff'd sub nom. Immerso v. U.S. Dep't of Lab.*, 2022 WL 17333083 (2d Cir. Nov. 30, 2022) (same).  "[I]t is not enough to note that governmental analysis, at some level, was based on data provided by an outside 'person.'"  *Nat. Res. Def. Council*, 36 F. Supp. 3d at 400.  However, the mere fact that an outside person's confidential information appears in a government-generated document is not sufficient to deprive it of protection.  "[I]nformation originally obtained from an outside source, but later included in agency documents, may be considered 'obtained from a person.'"  *COMPTEL v. Fed. Commc'ns Comm'n*, 910 F. Supp. 2d 100, 117 (D.D.C. 2012).

Plaintiff does not dispute that the Draft MOUs contain information "obtained from a person."  The Draft MOUs submitted by NATCA to the FAA self-evidently contain information "obtained from a person."  NATCA is a "person" under FOIA.  It is "an association of workers who have combined to protect or promote the interests of the members by bargaining collectively with their employers to secure better working conditions, wages, and similar benefits."  Dkt. No.

17

39 ¶ 6; Dkt. No. 38 ¶ 28.  The Draft MOUs submitted by NATCA contain only information

obtain from a person.

The Draft MOUs containing the FAA's counterproposals are not as obviously "obtained

from a person."  They were generated by the FAA and contain the FAA's counterproposals.

However, "Exemption 4 uses the term 'information' as opposed to document, memorandum,

paper, file record, contract, or provision."  *S. Envt'l Law Ctr. v. Tenn, Valley Auth.*, 2023 WL

2387360, at *9 (E.D. Tenn. Mar. 7, 2023).  Accordingly, "[t]he key inquiry is who 'the source of

the information [was] in the first instance,' and not necessarily who created the particular

document."  *Elec. Priv. Info. Ctr. v. U.S. Dept. of Homeland Sec.*, 928 F. Supp. 2d 139, 147

(D.D.C. 2013) (quoting *In Def. of Animals v. Nat'l Insts. of Health*, 543 F. Supp. 2d 83, 103

(D.D.C. 2008)).  As several courts have put it: "[T]he key distinction—which will obviously be

blurry in many instances—is between information that is either repeated verbatim or slightly

modified by the agency, and information that is substantially reformulated by the agency, such

that it is no longer a person's information but the agency's information."  *Nat. Res. Def. Council*,

36 F. Supp. 3d at 400 (quoting *S. All. for Clean Energy v. U.S. Dept. of Energy*, 853 F. Supp. 2d

60, 68 (D.D.C. 2012)); *see also Occupational Safety & Health Law Project, PLLC v. U.S. Dep't

of Labor*, 2022 WL 3444935, at *5 (D.D.C. Aug. 17, 2022) ("In short: has the agency taken

ingredients from the outside to create a new metaphorical dish, or instead offered tasting notes on

another's pre-prepared meal?").

The Draft MOUs with the FAA's counterproposals satisfy that test.  Although they

contain comments from the FAA, the comments address information provided directly from

NATCA in the Draft MOUs.  *See Flyers Rights Educ. Fund, Inc. v. Fed. Aviation Admin.*, 2021

WL 4206594, at *5 (D.D.C. Sept. 16, 2021).  Specifically, they follow NATCA's draft MOU

formatting and contain NATCA's bargaining positions because the FAA proposed different language in response to NATCA proposals by using track changes in a Microsoft Word document and tentatively agreed to other portions of NATCA proposals, pending final agreement.  Dkt. No. 39 ¶ 31.  Each of the proposed changes were part of the give-and-take of negotiation containing and reflecting NATCA's negotiating positions.  *Id.* ¶ 34.  In addition, the Draft MOUs memorialize oral proposals proffered, accepted, and/or accepted with compromise by both teams during a negotiation session, making it difficult if not impossible to segregate NATCA proposals from FAA proposals.  Dkt. No. 40 ¶ 10.

Finally, the third prong of Exemption 4's tripartite test asks whether the commercial or financial information "is both customarily and actually treated as private by its owner" and perhaps whether it is "provided to the government under an assurance of privacy."  *Food Mktg. Inst.*, 139 S. Ct. at 2366; *see also New York Times Co.*, 2021 WL 371784, at *8; *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 109 (D.D.C. 2019).  Defendant readily satisfies that part of the test.  It has offered evidence that NATCA treats its draft MOUs and negotiation positions as confidential and does not share them with its members in order to avoid setting unrealistic expectations.  Dkt. No. 39 ¶ 24.  According to NATCA, it "considers its proposals, as well as FAA's proposals to be confidential" and will "only share the proposals on a need-to-know basis among [the] bargaining team, national office staff, and elected/appointed union officers."  *Id.* ¶ 28.  It also has offered evidence that NATCA "actually" treated the Draft MOUs at issue here as private and confidential.  NATCA only shared its proposals and FAA's counterproposals "with those individuals who were responsible for negotiating the agreement and subject matter experts who were brought into the Union-side caucus to help draft the proposals and counterproposals" and "[a]ll proposals from both parties

were treated as confidential, close-hold." *Id.* ¶ 29.  In fact, on NATCA's side, "only two elected NATCA national officers, NATCA's chief of staff, and three NATCA staff attorneys were privy [to] NATCA's and FAA's proposals."  *Id.*  In addition, "NATCA submits proposals to the FAA with an expectation that FAA's bargaining team members likewise will keep the proposals confidential and only share them on a need-to-know basis."  *Id.* ¶ 28.  For its part, the FAA confirms that it "and NATCA have an understanding that the FAA will protect draft negotiating proposals from public disclosure," that "NATCA submitted to [the FAA] the information at issue . . . consistent with its past practices of confidentiality," and that the FAA "treated NATCA's draft negotiation proposals as confidential," which is the "customary practice in ATO and union negotiations."  Dkt. No. 40 ¶ 13.

The determination that the Draft MOUs are protected by Exemption 4 does not conclude the analysis.  In 2016, Congress enacted the FOIA Improvement Act of 2016 "out of concern that 'some agencies [were] overusing FOIA exemptions.'"  *Seife,* 43 F.4th at 235 (quoting S. Rep. No. 114-4, at 322 (2015), *as reprinted in* 2016 U.S.C.C.A.N. 321, 322).  For FOIA requests submitted after June 30, 2016, such as this one, an agency can withhold information only if it shows that the information falls within an exemption of FOIA and at least one of two additional requirements is met: "(I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or (II) disclosure is prohibited by law." 5 U.S.C. § 552(a)(8)(A)(i)(I)–(II).  Under the first element, it is not sufficient that disclosure would "destroy the private nature of the information."  *Seife*, 43 F.4th at 240 (quoting *Am. Small Bus. League v. United States Dep't of Def.*, 411 F. Supp. 3d 824, 836 (N.D. Cal. 2019)).  That would be true, by definition, of all information protected by Exemption 4.  "[T]he interests protected by Exemption 4 of FOIA are the commercial or financial interests of the submitter in information

that is of a type held in confidence and not disclosed to any member of the public by the person to whom it belongs." *Id*. Accordingly, the FAA must show "foreseeable commercial or financial harm to the submitter upon release of the confidential information." *Id.* at 242.

Defendant has established that the disclosure of NATCA's proposals and negotiating positions would cause foreseeable commercial harm to it both as a general matter and in this particular case. "NATCA represents a broad range of members whose interests and opinions can vary significantly across and within different facilities and/or areas of the country." Dkt. No. 39 ¶ 26. Moreover, the effectiveness of collective bargaining depends on the assurance that each party to the negotiation will keep the proposals confidential. Public negotiations lead parties to take more hardline positions, unlikely to be accepted by the other side, thus undermining both the purpose of collective bargaining and the commercial interests of each side to reach an agreement to protect the interests of its members or constituents. *Id.* ¶ 43. As a result, the disclosure of the proposals and counterproposals in this case would undermine NATCA's future collective bargaining efforts and would cause foreseeable harm to NATCA's commercial interest. *Id.* ¶ 41. It would limit NATCA's ability to be flexible in future negotiations over other topics, complicate NATCA's relationship with the FAA by forcing NATCA to publicly take hardline stances on future negotiation topics, and hinder NATCA's ability to effectively advocate in the best interest of the entire bargaining unit rather than managing the opinions and expectations of individual members. *Id.*

Finally, Plaintiff argues that Defendant has acted in bad faith, justifying *in camera* review. It argues that NATCA engaged in unfair labor practices, that the FAA violated Section 804 of the FAA Modernization and Reform Act of 2012, and that the FAA was delinquent both in responding to Plaintiff's appeal and in producing documents. Dkt. No. 44 at 17–21. None of

those arguments is sufficient to raise a genuine issue of material fact or to impugn the credibility

of the evidence upon which the FAA relies.  Plaintiff's argument that NATCA engaged in unfair

labor practices is seemingly based upon his view that the union compromised his interests and

the interests of those similarly situated to him who wished to remain in N90 and did not wish to

be internally reassigned within N90 in favor of the interests of others who were willing to move

or to be reassigned.  *Id*. at 19–20.  The relevant question in a FOIA case, however, is whether

there is "evidence suggesting bad faith on the part of the [agency]."  *Wilner v. NSA*, 592 F.3d 60,

75 (2d Cir. 2009) (quoting *Larson v. Dept. of State*, 565 F.3d 857, 864 (D.C. Cir. 2009)).  "[A]n

agency's justification for invoking a FOIA exemption is sufficient if it appears logical or

plausible."  *Id.* at 73 (quoting *Larson*, 565 F.3d at 862).  It does not turn upon the good faith or

bad faith of the "person" whose information is at stake and whether that person has treated the

requesting party fairly.  Indeed, FOIA generally is indifferent to the identity of the requestor.  *Id.*

This FOIA lawsuit does not provide the proper forum for Plaintiff to air his grievances

with the fairness of NATCA's representation.  *See Wisham v. Comm'r of IRS*, 2009 WL

2526245, at *3 (S.D.N.Y. Aug. 19, 2009) ("[T]he Federal Labor Relations Authority . . . has

exclusive jurisdiction over a claim that a union breached its duty of fair representation.").

Similarly, the claim that the FAA should have engaged in the process set out in Section

804 of the FAA Modernization and Reform Act of 2012 for certain realignments does not

provide support for an order requiring *in camera* review.  The Court's jurisdiction under FOIA is

limited to action "to enjoin the agency from withholding agency records and to order the

production of any agency records improperly withheld."  5 U.S.C. § 552(a)(4)(B); *see U.S. Dep't

of Just. v. Tax Analysts*, 492 U.S. 136, 142 (1989).  "[A] violation of an agency's own

regulations (even if those regulations are related to the FOIA) are not violations of the FOIA

itself and 'are properly addressed under the APA,' not the FOIA." *Nat'l Sec. Couns. v. Cent. Intel. Agency*, 960 F. Supp. 2d 101, 163 n.31 (D.D.C. 2013) (quoting *Nat'l Sec. Couns. v. Cent. Intel. Agency*, 898 F. Supp. 2d 233, 266 (D.D.C. 2012)).

Finally, a long line of cases holds that "without more, an agency's delay does not render that agency's response one that should be treated as made in bad faith or impugn the credibility of the agency's affiants, at least where the agency ultimately performs an adequate and reasonable search for records." *Smith v. U.S. Marshals Serv.*, 2021 WL 1177692, at *5 (S.D.N.Y. Mar. 29, 2021) (citing cases).

## II. The Adequacy of the FAA's Search

Plaintiff also alleges that the FAA failed to conduct an adequate search and to provide Plaintiff with a reasonably detailed affidavit describing the search performed.  Dkt. No. 29 ¶¶ 77–80.  In his memorandum in support of the motion for summary judgment, Plaintiff argues that the FAA has failed to sufficiently describe the records searched or the search process or why certain records were selected for search and not others.  Dkt. No. 44 at 6, 11.  He argues that the FAA improperly narrowly construed its search "to an undefined and ambiguous time frame" classified as "during the Collective Bargaining Negotiations" and limited the communications to correspondence from only two FAA employees, Mlakar and Pisman.  *Id.* at 7.

Defendant responds that Plaintiff has failed to exhaust administrative remedies and that, in any event, his arguments are based on speculation and decisively refuted by the declarations Defendant has submitted in support of summary judgment.  Dkt. No. 49 at 6–14.  The Court concludes that Defendant is entitled to summary judgment on both grounds.

Before seeking judicial review, a FOIA applicant must exhaust administrative remedies by completing the administrative appeal process.  *See* 5 U.S.C. § 552(a)(6)(A)(i)–(ii); *Roberts. v. Dept. of Just.*, 193 F. App'x 8, 9 (2d Cir. 2006) (summary order); *Caraveo v. U.S. Equal Emp.*

*Opportunity Comm'n.*, 96 F. App'x 738, 741 (2d Cir. 2004) (summary order); *Sloman v. U.S.*

*Dep't of Just.*, 832 F. Supp. 63, 65–66 (S.D.N.Y. 1993).  "The exhaustion requirement allows the

targeted agency to correct its own errors, which obviates unnecessary judicial review."

*Muzumala v. Mayorkas*, 2022 WL 2916610, at *3 (S.D.N.Y. July 22, 2022); *Buckley v. Amos*,

2015 WL 12564208, at *4 (E.D.N.Y. Oct. 16, 2015).

> The FOIA establishes the following administrative process:
>
> Each agency, upon any request for records . . . shall--(i) determine within 20 days
> (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any
> such request whether to comply with such request and shall immediately notify the
> person making such request of--(I) such determination and the reasons therefor[.]

5 U.S.C. § 552(a)(6)(A)(i); see 28 C.F.R. § 16.6(b), (c).  If the request is denied, the requester

may appeal the adverse determination to the head of the agency within 90 days.  5 U.S.C.

§ 552(a)(6)(A)(i)(III)(aa).  "A FOIA requester is deemed to have exhausted his administrative

remedies if he files a timely appeal but the agency does not respond within applicable limits."

*Frost v. U.S. Dep't of Homeland Sec.*, 2022 WL 1304534, at *2 (S.D.N.Y. May 2, 2022); *see*

*also* 5 U.S.C. § 552(a)(6)(C)(i).  The majority of the District Courts in this Circuit have held that

exhaustion of administrative remedies is not a jurisdictional bar to relief but a prudential doctrine

that may be addressed either on a motion to dismiss or on a motion for summary judgment.  *See*

*Buckley*, 2015 WL 12564208, at *4; *Roman v. C.I.A.*, 2013 WL 210224, at *5 (E.D.N.Y. Jan. 18,

2013) (Bianco, J.) (citing cases for the proposition that the Second Circuit has "expressed doubt

that exhaustion in the FOIA context is jurisdictional").  However, "[a]dministrative exhaustion

applies to issues and not to whole requests."  *Odland v. Fed. Energy Regul. Comm'n*, 34 F. Supp.

3d 3, 14 (D.D.C. 2014).  It thus is not sufficient that the requester has exhausted administrative

remedies with respect to some issues; she must also exhaust administrative remedies with respect

to the issue as to which she seeks judicial review.  *See Porter v. C.I.A.*, 778 F. Supp. 2d 60, 68 (D.D.C. 2011).

Plaintiff's challenge to the adequacy of Defendant's search is barred because he has failed to exhaust administrative remedies.  Plaintiff took an administrative appeal of the FAA's May 17, 2021 response to Plaintiff's FOIA request to the FAA's FOIA Program Management Division.  Dkt. No. 38 ¶ 18.  The appeal challenged the FAA's withholdings under Exemption 2 and Exemption 4.  *Id.*  However, it did not challenge the adequacy of the FAA's search for documents responsive to Plaintiff's FOIA request.  *Id.*; Dkt. No. 38-6.  Plaintiff's failure was not for lack of information.  Plaintiff had all the information then that he alleges now to challenge the adequacy of the search.  He alleges that the search was deficient because he claims there had to be "records exchanged between the FAA and NATCA discussing the applicability of Section 804."  Dkt. No. 44 at 8.  His view that the search was unduly narrow is predicated on the assumption that records must have existed and on the fact that such records were neither produced nor withheld.  But Plaintiff knew all of that at the time he undertook his administrative appeal.  Defendant's May 2021 production consisted of records marked "(b)(2), (b)(4) . . . pages draft MOU."  Dkt. No. 38-5 at ECF pp. 5, 13, 29, 56.  No other records were produced or indicated as withheld.  Thus, to the extent that Plaintiff's argument is based on Defendant's failure to produce records that he claims must have existed, that argument could have been made just as easily in an administrative appeal as it is made now.  His failure to have done so, and to have given the FAA the opportunity to address his complaint administratively, bars him from obtaining judicial review of that issue.

There is no merit to Plaintiff's argument that he should be deemed to have exhausted his administrative remedies with respect to his adequacy challenge because the FAA failed to

respond to his administrative appeal within the statutory time limits.  A person is deemed to have "constructively" exhausted his administrative remedies when he has properly filed an administrative appeal but the agency failed to comply with applicable time limits.  *See Pinson v. U.S. Dep't of Justice*, 145 F. Supp. 3d 1, 9 (D.D.C. 2015) (citing 5 U.S.C. § 552(a)(6)(C)(i)). "Where . . . the agency belatedly responds only *after* the plaintiff has filed suit, the plaintiff is nevertheless considered to have constructively exhausted his administrative remedies."  *Id.* (emphasis in original).  For that reason, Plaintiff's challenge to Defendant's withholding of the Draft MOUs pursuant to Exemption 4 is judicially cognizable.  Plaintiff appealed that issue and Defendant did not address the issue within the applicable time limits.  However, the doctrine of constructive exhaustion applies with respect to issues that have been administratively appealed. Plaintiff has not cited a single case that supports the proposition that, based on exhaustion of some other issue, he should be deemed to have constructively exhausted a separate issue he could have raised administratively but did not.

Moreover, even if Plaintiff's claim were not barred by his failure to exhaust administrative remedies, Defendant would be entitled to summary judgment because Plaintiff has failed to identify a genuine issue of material fact.  It is well established that the agency bears the burden to demonstrate "beyond material doubt that it has conducted a search reasonably calculated to uncover all relevant documents."  *Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't Agency*, 877 F. Supp. 2d 87, 95 (S.D.N.Y. 2012) (quoting *Morley v. Cent. Intel. Agency*, 508 F.3d 1108, 1114 (D.C. Cir. 2007)); *see also Int'l Couns. Bureau v. U.S. Dep't of Def.*, 657 F. Supp. 2d 33, 38 (D.D.C. 2009) (same).  "This standard does not demand perfection, and thus failure to return all responsive documents is not necessarily inconsistent with reasonableness: an agency is not expected to take extraordinary measures to find the requested

records, but only to conduct a search reasonably designed to identify and locate responsive

documents." *Pucci v. Requester Commc'n Branch*, 2018 WL 6804005, at *2 (S.D.N.Y. Dec. 27,

2018) (quoting *Adamowicz v. IRS*, 672 F. Supp. 2d 454, 462 (S.D.N.Y. 2009)).

"Under Second Circuit law, to establish the adequacy of a search, agency affidavits must

be . . . relatively detailed and nonconclusory." *NAACP Legal Def. & Educ. Fund, Inc. v. Dep't*

*of Just.*, 463 F. Supp. 3d 474, 483 (S.D.N.Y. 2020) (Nathan, J.) (internal quotation marks

omitted) (quoting *Grand Cent. P'ship, Inc.*, 166 F.3d at 488–489). Affidavits submitted by an

agency are "accorded a presumption of good faith." *Safecard Servs., Inc. v. SEC*, 926 F.2d 1197,

1200 (D.C. Cir. 1991); *see also Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994)

(same). "A 'satisfactory agency affidavit should, at a minimum, describe in reasonable detail the

scope and method by which the search was conducted.'" *NAACP*, 463 F. Supp. 3d at 483

(quoting *Amnesty Int'l USA v. CIA*, 2008 WL 2519908, at *8 (S.D.N.Y. June 19, 2008)). "If a

court makes a threshold determination that an agency affidavit is sufficiently specific, it then

proceeds to consider whether the underlying search was reasonable." *Id.* at 484. To demonstrate

that the underlying search was reasonable, "an agency must search all locations likely to contain

responsive records; not simply where the records are 'most likely' to be found." *Id.* (quoting

*Knight First Amend. Inst. at Columbia Univ. v. U.S. Dep't of Homeland Sec.*, 407 F. Supp. 3d

311, 324 (S.D.N.Y. 2019)). In applying this standard, courts consider the search terms, the type

of search performed, and where the agency searched for the records. *Id.*; *see also Garcia v. U.S.*

*Dept. of Just., Off. of Info. & Priv.*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002). The presumption

of good faith that attaches to the defendant's declarations "cannot be rebutted by purely

speculative claims about the existence and discoverability of other documents." *Garcia*, 181 F.

Supp. 2d at 366 (S.D.N.Y. 2002) (quoting *SafeCard Servs., Inc.*, 926 F.2d at 1200).

Defendant has satisfied those standards.  Plaintiff's FOIA request called for "any records of communication or Memorandums of Understanding between Paul Rinaldi, President of NATCA and the Federal Aviation Administration regarding the transfer of the EWR area from NEW YORK TRACON to PHL between the time period of Jan.1 2019 to the present day."  Dkt. No. 38-2 at ECF pp. 1–2.  Defendant conducted a search reasonably calculated to identify all responsive documents.  It is undisputed that Mlakar is the primary representative of the ATO on FAA labor matters involving unions; that she served as the lead member of the FAA's negotiation team during the collective bargaining negotiations between the FAA and NATCA; and that, as the lead negotiator for the FAA negotiation team, she was included on each email exchanged during the collective bargaining negotiations.  Dkt. No. 40 ¶¶ 1–2, 14, 16.  Plaintiff has not identified any facts that would cast doubt on those factual assertions.  It is also undisputed that the negotiations took place among a limited number of people, each of whom was expected to keep them confidential.  On the FAA's side, the negotiators were Pisman, Mlakar, and Vincent.  *Id*. ¶ 10.  On NATCA's side, they would have included Rinaldi, Iacopelli, Vitale, Mason, and Mulkey.  *Id*. ¶ 14.  Mlakar conducted a search reasonably calculated to identify records of communication or Memorandums of Understanding between Rinaldi and the FAA regarding the Realignment between the time period of January 1, 2019 to the present day.  She searched her emails for the terms, "Paul Rinaldi," "Dean Iacopelli," Nicole Vitale," "Kendal Mason," "Wendy Pisman," and "Grant Mulkey."  *Id*.  She also searched using the terms "EWR Airspace Realignment" and "NATCA" to ensure that she captured responsive records.  *Id*.  In addition, Pisman also conducted the same search in her own FAA Microsoft Outlook email account.  *Id*. ¶ 16.  Finally, on November 16, 2022, the FAA conducted searches of the FAA Microsoft Outlook email accounts of Jeffrey Vincent and other FAA employees Wilbanks, Doss,

and Glading, who had been copied on emails for their situational awareness, using the search terms used by Mlakar.  *Id.* ¶ 17.  Those searches, using a date range of August 1, 2020 to May 2021, did not uncover additional records responsive to Plaintiff's FOIA Request.  *Id.*

Plaintiff's argument that FAA limited its search to an "unclear and ambiguous" timeframe is mistaken.  Dkt. No. 44 at 14.  The FAA's search utilized a timeframe of August 2020, when the FAA notified NATCA of the Realignment Determination to May 2021, when the FAA made its initial production to Plaintiff.  Dkt. No. 40 ¶ 14 n.3.  Also mistaken is Plaintiff's argument that the FAA unduly restricted the custodians and records of persons it searched. Mlakar, Pisman, Vincent, Wilbanks, Doss, and Glading were the only persons reasonably likely to have been copied on responsive records.  Plaintiff has not identified any other individual from the FAA likely to possess records of communication or MOUs between Rinaldi and the FAA regarding the Realignment Determination.

Plaintiff's challenge to the adequacy of the search is based on rank speculation.  *See Garcia*, 181 F. Supp. 2d at 366 (S.D.N.Y. 2002).  Plaintiff argues that "[g]iven … that NATCA only supports realignments of air traffic control facilities in accordance with Section 804," there must have been "correspondence regarding the statute's circumnavigation exchanged between Defendant and NATCA."  Dkt. No. 44 at 12.  The flaw in Plaintiff's argument, however, is that Section 804 requires Congressional reporting only when the FAA realigns or consolidates services and facilities for the purposes of reducing capital, operating costs, maintenance costs, and administrative costs of the FAA when such cost reductions can be implemented without adversely affecting safety.  There is sworn evidence that the FAA determined that Section 804 did not apply to the Realignment Determination.  Dkt. No. 40 ¶ 20.  Therefore, the FAA did not create records pertaining to the Section 804 process.  *Id.*

Finally, the adequacy of the FAA's search is confirmed by the three supplemental searches the agency conducted following the filing of its motion for summary judgment.  A search of the same custodians with additional search terms yielded one additional responsive record—a non-substantive email within an email chain that had previously been produced to Plaintiff in April 2022, in which a NATCA official stated, "Thank you, Shelly.  We will review and get back to you with any follow-up questions."  Dkt. No. 50 ¶ 6.  A second supplemental search was conducted of the individuals who attended the meeting during which the FAA orally informed NATCA of the Realignment Determination and its determination that the realignment was not governed by Section 804 for documents related to the Section 804 determination.  No responsive documents were identified.  *Id.* ¶ 7.  A third supplemental search was conducted of two individuals who had been copied on or involved in some non-responsive communications with NATCA; that search also did not identify any further responsive documents.  *Id.* ¶¶ 8–9.

In short, the FAA's search was adequate.  Nothing further is required.

## CONCLUSION

Defendant's motion for summary judgment is GRANTED and Plaintiff's motion for summary judgment is DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 36 and to close this case.

SO ORDERED.

Dated: June 2, 2023
     New York, New York
                                   LEWIS J. LIMAN
                                United States District Judge